67 P.3d 1068 (2003)
149 Wash.2d 288
Khene KOMMAVONGSA, individually and as guardian ad litem of Sivilay T. Nammathao, an incompetent, Appellant,
v.
Stephen HASKELL and Jane Doe Haskell, his wife, Stephen K. Eugster and Jane Doe Eugster, his wife, Christopher M. Grimes and Jane Doe Grimes, his wife, and the law firm of Eugster Haskell, Respondents. and
Allstate Insurance Company, a foreign corporation, and Marybeth and John Doe Conger, a marital community, Brian Sheldon and Jane Doe Sheldon, a marital community, Defendants.
Phoukeo Nammathao, individually and as guardian ad litem of Napha T. Nammathao, an incompetent, Appellant,
v.
Stephen Haskell and Jane Doe Haskell, his wife, Stephen K. Eugster and Jane Doe Eugster, his wife, Christopher M. Grimes and Jane Doe Grimes, his wife and the law firm of Eugster Haskell, Respondents.
Allstate Insurance Company, a foreign corporation, and Marybeth and John Doe Conger, a marital community, Brian Sheldon and Jane Doe Sheldon, a marital community, Defendants.
No. 71713-3.
Supreme Court of Washington, En Banc.
Argued May 16, 2002.
Decided May 1, 2003.
*1070 A. Graham Greenlee, Lenell Nussbaum, Seattle, for Appellant.
Peter Johnson, Hugh Lackie, Amy Clemmons, Spokane, for Respondent.
*1069 KENNEDY, J.[*]
This case, which was certified for direct review by Division Three of the Court of Appeals, raises a narrow question of first impression in Washington: Whether a legal malpractice claim is assignable to an adversary in the same litigation that gave rise to the alleged legal malpractice. We answer that narrow question in the negative on grounds of public policy, leaving for another day the broader issue of whether legal malpractice claims may be assignable in other circumstances. In so ruling, we affirm the judgment of the Spokane County Superior Court in these consolidated proceedings, insofar as the court ruled that the assignment in this case violates public policy, and insofar as the court permitted substitution of the assignor as the real party-plaintiff in interest. But we reverse the court's ruling that the substitution did not relate back to the initial filing date of the legal malpractice action under CR 17(a), so that the action was barred by the statute of limitations, and we remand so that the legal malpractice claim may proceed in normal course as between the proper parties thereto.

FACTS
On August 19, 1995, 39-year-old Sivilay Nammathao and her 10-year-old daughter Napha Nammathao were riding in a vehicle being driven by Khamchanh Soratsavong on State Route 395 in Franklin County, Washington. Mr. Soratsavong, whom Sivilay Nammathao recognized as her husband although the parties were not married, fell asleep while driving, and the vehicle rolled over. Sivilay Nammathao sustained a severe brain injury and remains in a vegetative state. The child Napha suffered a concussion, internal injuries, and fractures of the leg and pelvis. Because Sivilay Nammathao is legally incompetent as a result of her injuries, and Napha is a minor, guardians ad litem were appointed for each, for the purpose of the personal injury lawsuits that followed. Khene Kommavongsa was appointed as the guardian ad litem for Sivilay Nammathao, and Phoukeo Nammathao was appointed as the guardian ad litem for Napha.
On May 18, 1996, each guardian ad litem served Mr. Soratsavong with a summons and complaint for personal injuries that had been filed in Benton County Superior Court, alleging that the injuries to the mother and child were the result of negligence on the part of Mr. Soratsavong.
Mr. Soratsavong was insured by Allstate Indemnity Company, with policy limits of $50,000. The record is silent as to whether Mr. Soratsavong notified Allstate when he was served with the lawsuits. On July 5, 1996, the Benton County Superior Court entered orders of default against Mr. Soratsavong for failure to appear and defend the lawsuits. No default judgments were entered at that time.
Allstate learned about the orders of default on July 15, 1996, and retained the Eugster Haskell law firm to appear for its insured, *1071 and to move to set aside the orders of default. The law firm took no immediate action. On August 30, 1996, the guardians ad litem submitted affidavits setting forth the extent of Sivilay and Napha's injuries. On September 11, 1996, the court entered default judgments of liability in each of the lawsuits, leaving the damages amounts blank.
On October 11, 1996, Christopher Grimes, an associate at Eugster Haskell, filed a motion to vacate the order of default in Sivilay Nammathao's case. He did not file a motion in Napha's case. The motion in Sivilay Nammathao's case was denied because a default judgment of liability had already been entered, and no meritorious defense was proposed. The law firm took no further action in either lawsuit. Allstate eventually tendered the $50,000 policy limits into the registry of the court.
On February 21, 1998, Eugster Haskell withdrew as counsel for Mr. Soratsavong. On February 23, 1998, Allstate retained Patrick McMahon to appear for Mr. Soratsavong and to move to set aside the default judgments. Mr. McMahon filed motions to vacate the default judgments in both cases, but the motions were denied because they were brought more than one year after entry of the judgments.
In late 1998, the guardians' attorney contacted Allstate to attempt negotiation of the monetary amount of the default judgments. The guardians' attorney expressed interest in satisfying the judgments against Mr. Soratsavong in exchange for an assignment of Soratsavong's legal malpractice claim against Eugster Haskell. Allstate referred the guardians' attorney to Eugster Haskell.
Thereafter, the guardians' attorney and Mr. Soratsavong's attorney began negotiating a settlement agreement. On September 9, 1999, the attorneys for the guardians ad litem and Mr. Soratsavong stipulated that the monetary amount of Sivilay Nammathao's damages was $12,244,129.39 and that the monetary amount of Napha's damages was $177,136.15. That same day, the trial court entered default judgments nunc pro tunc for these amounts. By the terms of the settlement, Mr. Soratsavong, who is of limited means, contributed the $50,000 policy limits toward satisfaction of the judgments. And in exchange for the guardians' covenant not to execute upon the remainder of the judgments, Mr. Soratsavong assigned to the guardians his legal malpractice claim against the Eugster Haskell law firm, its principals Stephen Eugster and Stephen Haskell, and its associate Christopher Grimes.
The following day, the guardians ad litem petitioned and were appointed as guardians ad litem for Sivilay Nammathao and Napha Nammathao, for purposes of bringing the legal malpractice claim. On that same day, each of the guardians filed a separate legal malpractice lawsuit, individually and as guardian ad litem of Sivilay Nammathao and Napha Nammathao, respectively, in Spokane County Superior Court. The complaints alleged that the default judgments were the result of the defendants' failure to properly defend Mr. Soratsavong from the Benton County personal injury lawsuit by timely moving to vacate the orders of default and default judgments.
Eugster Haskell and the individual defendants appeared through counsel, and subsequently moved to consolidate the legal malpractice actions, which motion was granted. On May 24, 2000, the defendants moved to dismiss the consolidated claims under CR 12(b) and CR 56, on the basis that assignments of legal malpractice claims are void as against public policy in Washington. The guardians ad litem responded to the motion on June 12, 2000, arguing that there is no prohibition against assigning legal malpractice claims in Washington, but if the court were to conclude to the contrary, they should be permitted to substitute Mr. Soratsavong as the party plaintiff. On June 22, 2000, the trial court announced its oral decision, ruling that legal malpractice claims cannot be assigned in Washington on grounds of public policy, and ruling that Mr. Soratsavong could be substituted as the party plaintiff, upon a proper motion.
On August 7, 2000, the guardians ad litem filed their motion to substitute Mr. Soratsavong as the party plaintiff, and on August 10, 2000, Mr. Soratsavong signed and filed a document in which he joined in that motion *1072 and in which he ratified the legal malpractice lawsuits. On August 17, 2000, the defendants filed a memorandum in opposition to the motion to substitute party plaintiff, and sought dismissal of the consolidated lawsuits, on grounds that the statute of limitations had run and that any substitution of party plaintiff should not relate back to the date the malpractice lawsuits were filed.
On November 13, 2000, the trial court entered its order in the consolidated proceedings, granting the motion to substitute Mr. Soratsavong as the party plaintiff, but ruling that the substitution would not relate back to the filing of the complaints under CR 17(a) and CR 15(c). Contemporaneously, the trial court entered an order dismissing the legal malpractice lawsuits on the ground that the statute of limitations had run before Mr. Soratsavong was substituted as the proper party plaintiff.
The guardians ad litem appealed to Division Three of the Court of Appeals. That court certified the appeal to this court, and we accepted the certification because the assignability of legal malpractice claims presents a legal question of first impression in Washington.

Standard of Review
Legal questions of first impression (like other legal questions) are reviewed de novo. City of Univ. Place v. McGuire, 144 Wash.2d 640, 649, 30 P.3d 453 (2001). A trial court's ruling on relation back under CR 17(a) and CR 15(c) is reviewed for abuse of discretion. Nepstad v. Beasley, 77 Wash.App. 459, 468, 892 P.2d 110 (1995).

ANALYSIS

I
The traditional test for assignability of a cause of action in Washington is this: "Does the cause of action survive to the personal representative of the assignor? If it does, the cause of action is assignable." Cooper v. Runnels, 48 Wash.2d 108, 110, 291 P.2d 657 (1955). See also Harvey v. Cleman, 65 Wash.2d 853, 855, 400 P.2d 87 (1965); Woody's Olympia Lumber, Inc. v. Roney, 9 Wash.App. 626, 633, 513 P.2d 849 (1973).
The legislature has provided for the survival of all causes of action in Washington, subject to certain limitations upon who may recover for "damages for pain and suffering, anxiety, emotional distress, or humiliation personal to and suffered by a deceased...." RCW 4.20.046(1).[1] But even where assignability is the general rule, some 18 jurisdictions have held that public policy considerations dictate a different rule for legal malpractice claims.[2]
*1073 In Picadilly, Inc. v. Raikos, 582 N.E.2d 338 (Ind.1991) the Indiana Supreme Court held that a party may not assign a legal malpractice claim to someone who was his adversary in the underlying litigation. One Charles Colvin was injured in an automobile accident caused by a drunken patron of Picadilly's bar. Colvin sued the drunken driver and Picadilly's. Attorneys Gustin Raikos and Dennis Thomas defended Picadilly's in the lawsuit. The jury awarded Colvin $75,000 in compensatory damages and $150,000 in punitive damages. Picadilly's subsequently sued Raikos and Thomas for legal malpractice, claiming that they negligently failed to object to an erroneous instruction on punitive damages, leading to the six-figure punitive damages award.
In the meantime, Picadilly's had sought protection from its creditors, including Colvin, in a Chapter 11 (Title 11 U.S.C.) reorganization action. After the state court dismissed Picadilly's legal malpractice claim on summary judgment, the bankruptcy court approved Picadilly's plan of reorganization, in which Colvin's punitive damages award was discharged in bankruptcy, and Colvin received an assignment of Picadilly's malpractice claim against Raikos and Thomas. Colvin's attorney, William Conour, the same attorney who had represented him in the underlying personal injury action, then moved to correct alleged errors concerning the entry of summary judgment in the malpractice actionostensibly as Picadilly's attorney. The trial court denied the motion to correct errors. Picadilly's appealed. The intermediate appellate court split over the question of assignability of the malpractice claim, and the case was transferred to the Indiana Supreme Court. Picadilly, 582 N.E.2d at 338-39.
The Picadilly court observed that the common law in most states, including Indiana, teaches that any chose in action that survives the death of the assignor may be assigned. This rubric dates from an English statute enacted in 1330, which permitted the executor of a decedent's estate to sue on actions for trespass to chattels owned by the decedent. Over the centuries, courts interpreting this statute came to view assignment and survival as "convertible propositions." Id. at 340-41 (citing 4 Edw. 3, ch. 7 (1330); Annotation, Assignability of Claim in Tort for Damage to Personal Property, 57 A.L.R.2d 603, 605, 619 (1958); Zabriskie v. Smith, 13 N.Y. 322, 334 (1855)). But "although survival is the usual test for assignability, it is not the only test." Id. at 341 (citing N. Chi. St. R.R. v. Ackley, 171 Ill. 100, 49 N.E. 222 (1897)). The court concluded that rather than relying entirely on ancient common law rules that may have outlived their usefulness, "[a]ssignment should be permitted or prohibited based on the effect it will likely have on modern society, and the legal system in particular." Id. Because the Indiana Constitution gives the Indiana Supreme Court exclusive original jurisdiction over matters relating to the practice of law, the Picadilly court found it fitting to closely examine the effect that allowing assignment of malpractice claims likely will have on the practice of law.[3]Id.
The Picadilly court concluded that to allow the assignment of malpractice claims, particularly to allow such assignments to one's adversary in the same litigation that gave rise to the alleged malpractice, would weaken at least two standards that define the lawyer's duty to the client: the duty to act loyally and the duty to maintain client confidentiality. Id. at 342. As for the duty to act loyally:
If assignments were permitted, we suspect that they would become an important bargaining chip in the negotiation of settlements particularly for clients without a deep pocket. An adversary might well make a favorable settlement offer to a judgment-proof or financially strapped client in exchange for the assignment of that client's right to bring a malpractice *1074 claim against his attorney. Lawyers involved in such negotiations would quickly realize that the interests of their clients were incompatible with their own self-interest. The [United States Supreme Court] has suggested that attorneys representing such clients would be bound by loyalty to sacrifice their own hides (and the deep pockets of their malpractice insurance carriers) in order to secure a favorable settlement for their client[s].
Picadilly, 582 N.E.2d at 343 (citing by analogy Evans v. Jeff D., 475 U.S. 717, 728, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986)) (holding that trial court did not abuse its discretion under the federal Civil Rights Attorney's Fees Award Act of 1976 (Fees Act), 42 U.S.C. § 1988, by approving settlement of a class action lawsuit brought to enforce civil rights of handicapped children in the state of Idaho which was conditioned upon waiver of statutory attorney fees; observing that plaintiffs' attorney's decision to recommend acceptance of the otherwise highly favorable settlement, even though it meant that the legal aid society which employed him would not be paid a fee, was "consistent with the highest standards of our profession"); and also citing Justice Brennan's dissent, 475 U.S. at 743-66, 106 S.Ct. 1531 (permitting trial courts to approve settlements that are conditioned upon fee waivers will frustrate congressional purpose for enacting Fees Act, which was to encourage lawyers to undertake representation of the poor whose civil rights have been violated, because: (1) defense lawyers will condition settlement offers on fee waivers as a matter of course, in order to serve their clients' best interests; (2) indigent plaintiffs will not care because they cannot afford to pay legal fees in any event; and (3) plaintiffs' lawyers will be ethically restricted from opposing settlements that are favorable to their clients merely because the offer is conditioned on fee waiver; once burned, however, legal aid societies and private counsel alike will be extremely reluctant to pursue civil rights claims for the poor in the future). The Picadilly court wryly remarked that the legal system should seek to limit the occasions on which attorneys are put to such difficult choices. Picadilly, 582 N.E.2d at 343 n. 7.
As for the duty of lawyers to maintain client confidences and secrets, the Picadilly court observed that once a client sues his attorney, the attorney is permitted to disclose confidential client information that is reasonably necessary to establish a defense. So long as the client maintains control over the suit, the scope of the disclosure can be limited by the client's power to drop the claim. Once the client assigns the claim, the client's control over the litigation is lost, but the attorney's right to defend by revealing client information survives. Clients who might be sophisticated enough to foresee this possibility and elect to withhold damaging information from their attorneys would be no better served than less sophisticated clients who might be blind-sided by it; either result would erode the principles fostered by the duty of confidentiality. Picadilly, 582 N.E.2d at 343.
Finally, the Picadilly court was concerned about the erosion of public confidence in the legal system that is likely to follow from assignment of legal malpractice claims to an adversary in the same litigation that gave rise to the alleged malpractice. The court used the Colvin-Picadilly's litigation to illustrate the problem. To prove legal malpractice, the plaintiff must show (1) employment of the attorney (giving rise to the duty), (2) failure by the attorney to exercise ordinary skill and knowledge (breach of the duty), (3) proximate cause (causation), and (4) resulting loss to the client (damages).[4] To prove causation, the client must show that the outcome of the underlying litigation would have been more favorable, but for the attorney's negligence. This proof typically requires a "trial within a trial":
Where the attorney's alleged act of malpractice occurred at trial, as is the situation here, the entire course of events at the first trial becomes relevant to the malpractice claim. In this case, the trial within a trial would consist of the re-presentation of *1075 the evidence and argument given in Picadilly I [Picadilly, Inc. v. Colvin, 519 N.E.2d 1217 (Ind.1988)]. The only change permitted would be in the jury instructions on punitive damages which Picadilly claims erroneously led to the punitive damage award. In Picadilly I, of course, Colvin bore the burden of proving Picadilly was liable for his injuries. Colvin took a very clear position to meet this burden. Every pleading filed, every witness called, and every argument made on Colvin's behalf was designed to lead the trier of fact to this conclusion. Colvin's attorney, William Conour, argued in his opening statement that Picadilly's manner of dispensing drinks cafeteria style "manufacture[d] drunks." In his closing argument, Conour eloquently asked the jury to assess punitive damages against Picadilly for the manner in which it sold alcohol:
You will be instructed by the court that you have the authority in this case to award punitive damages against Picadilly's for this unregulated warehouse of alcohol and this assembly line procedure. It's your decision. It's your choice, as members of the community whether or not to allow that type of conduct to continue or whether you can stand up and be counted and help stop the carnage and death that happens on the highways as a result of this type of intoxication.... And this bar, this Piccadilly's [sic] is the most irresponsible of all.... And Chad [Colvin] is entitled to compensatory damages for him. But these punitive damages, they're for us. They're for our future.
In Picadilly II, Colvin and his lawyer Conour must necessarily bear the burden of proving a proposition directly contrary to the proposition they successfully proved in Picadilly I. They now assert that it was Picadilly's attorneys, and not Picadilly's manner of selling alcohol, that led the jury to award $150,000 in punitive damages. Because of the unique nature of the trial within a trial, Colvin's change in position would be obvious to all the jurors hearing the evidence in Picadilly II. They would rightly leave the courtroom with less regard for the law and the legal profession than they had when they entered.
Picadilly, 582 N.E.2d at 344-45 (emphasis added) (alterations in original) (citations omitted).
These considerations persuaded the Supreme Court of Indiana that clients should not be allowed to sell off their legal malpractice claims for pursuit by others, and particularly not to their adversaries in the same litigation that gave rise to the alleged legal malpractice. Although Washington does not permit punitive damages in personal injury cases, legal malpractice claims arising from alleged negligence of lawyers in the course of litigation typically require the same "trial within a trial" procedure as in Indiana.[5] Thus, the hypothetical envisioned by the Indiana Supreme Court would likely happen in Washington, if we were to place no limitation upon assignment of legal malpractice claims to the same adversary whose lawsuit gave rise to the underlying litigation in which the alleged legal malpractice occurred.
In Coffey v. Jefferson County Board of Education, 756 S.W.2d 155 (Ky.Ct.App.1988) the Kentucky Court of Appeals rejected an assignment of a claim for legal malpractice by the defendant in a wrongful death action to the plaintiff in the same action. The assignment, like the one in the instant matter, had been given in exchange for a covenant not to execute judgment. A seven-year-old child was tragically killed when a concrete sewer pipe rolled onto him while he was playing near the playground of a closed school. The sewer pipe had been part of the playground equipment. The playground was being dismantled, and a fence that had held the sewer pipe in place had been removed. Over a weekend break in the work, neighborhood children loosened the pipe, and as they rolled it about as an item of play, it rolled onto the child and killed him. The child's mother sued the school board, its individual *1076 members, and one Joe Coffey, the director of grounds for the school board. The board hired Preston Young to defend the case. Mr. Young was successful in obtaining a summary judgment dismissing all of the defendants except Joe Coffey. The school board did not feel obligated to defend Mr. Coffey any longer, and terminated Mr. Young's services prior to trial of the claim against Coffey.
On the day of trial, Mr. Coffey and the child's mother appeared before the trial court. Mr. Coffey, who was represented by new counsel, confessed judgment for $1,000,000, the child's mother signed a covenant not to execute the judgment against Coffey, and Coffey assigned his claim for legal malpractice against attorney Young to the mother. The child's mother then initiated suit against Young. The trial court entered summary judgment in favor of Young, and the mother appealed.
The Kentucky Court of Appeals affirmed, on several grounds: First, the entire transactionthe confession of judgment and the covenant not to execute judgment in exchange for the assignment of the legal malpractice claimwas so collusive as to give no indication of actual damages to Coffey arising from attorney Young's alleged legal malpractice; thus, proximate cause and damages could not be established based on that transaction, and summary judgment was proper. Coffey, 756 S.W.2d at 156. Second, the whole transaction was so collusive as to violate public policy, in and of itself. Id. at 157 (citing Doser v. Middlesex Mut. Ins. Co., 101 Cal.App.3d 883, 162 Cal.Rptr. 115 (1980)). Third, legal malpractice claims are not assignable in Kentucky for compelling reasons of public policy arising out of the uniquely personal nature of legal services and the confidential attorney-client relationship. Id. (citing Goodley v. Wank & Wank, Inc., 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976)). See also Wagener v. McDonald, 509 N.W.2d 188 (Minn.Ct.App.1993) (recognizing the risk of collusion as a basis for holding that legal malpractice claims are not assignable in Minnesota).
A federal judge in the District Court of New Jersey grappled with a similar situation in Alcman Services Corp. v. Samuel H. Bullock, P.C., 925 F.Supp. 252 (1996), aff'd, 124 F.3d 185 (1997), a case in which the trial court was called upon to determine whether legal malpractice claims are assignable in the state of New Jersey. Alcman purchased an apartment building in Pennsylvania, hired a general contractor to renovate the building, and also hired Majek Fire Prevention, Inc., to install a fire protection system. A year later, Alcman filed a lawsuit in Philadelphia, alleging that the general contractor and Majek had not adequately performed their contractual obligations. Majek hired the Bullock law firm to represent it. The Bullock firm practiced in New Jersey, but one of its lawyers was licensed in Pennsylvania and undertook the representation there. A default judgment was entered against Majek for $7,000,000. The default judgment was never vacated. In order to obtain the default judgment for $7,000,000 Alcman filed an affidavit representing that Majek lawfully owed that amount of money.
Alcman domesticated the judgment by registering it in New Jersey, and was able to collect $4,000 from Majek, but Majek was a very small company with few assets. Majek assigned its legal malpractice claim against the Bullock law firm to Alcman, in exchange for Alcman's agreement to stay execution of the judgment. The agreement contained a choice of law provisions stating that the assignment would be construed and interpreted under New Jersey law.
Alcman then filed a complaint in federal district court, alleging that Bullock's malpractice was the proximate cause of the $7,000,000 judgment against Majek. Bullock moved for summary judgment on the ground that New Jersey prohibits the assignment of claims for legal malpractice, particularly in cases where the assignment is to an adversary in the same underlying litigation that gave rise to the claim of malpractice. The court agreed, on two interrelated grounds: judicial estoppel and public policy.
The court first observed that in order to prove legal malpractice, Alcman would have to show that the $7,000,000 judgment was obtained not because Majek lawfully owed that sum but because Bullock was negligent *1077 in failing to move to set aside the default judgment. This is because no matter how negligent the Bullock law firm may have been, if Majek lawfully owed Alcman $7,000,000 no damages were proximately caused by the alleged negligence of the law firm. Alcman, 925 F.Supp. at 256-57. But in order to obtain the $7,000,000 judgment in the first place, Alcman had to provide sworn evidence that Majek did lawfully owe that sum. Accordingly, Alcman would be barred by the doctrine of judicial estoppel from coming into another court alleging and seeking to prove that, but for Bullock's alleged negligence, judgment for some lesser amount, or no judgment at all, would have been entered against Majek. Id. (citing Koppel v. Olaf Realty Corp., 56 N.J.Super. 109, 151 A.2d 577, 583 (1959), aff'd, 62 N.J.Super. 103, 162 A.2d 306 (1960)).[6]
The Alcman court also predicted that the New Jersey state courts, if faced with the issue, would bar assignment of legal malpractice claims under all circumstances, for compelling reasons of public policy:
A party should not be permitted to transmute a claim against a penniless adversary into a claim against the adversary's wealthier lawyer based on the lawyer's supposed negligence towards the adversary. A legal malpractice action is not a commodity to be sold to a bidder who has never even had a relationship with the lawyer. The decision to bring a legal malpractice action "is one peculiarly vested in the client." Chaffee v. Smith, 98 Nev. 222, 645 P.2d 966 (1982). There is, in addition, a high risk that the plaintiff and defendant in the underlying litigation will collude to the detriment of the defendant's lawyer. See, e.g., Coffey v. Jefferson County Board of Education, 756 S.W.2d 155 (Ky.App.Ct.1988); Wagener v. McDonald, 509 N.W.2d 188 (Minn.App.1993). Permitting this sort of alchemy would lead to baseless and excessive legal malpractice claims and would undermine the personal confidence that must exist between lawyers and clients. See, e.g., Goodley v. Wank & Wank, Inc., 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976).
Alcman, 925 F.Supp. at 258.
In Zuniga v. Groce, Locke & Hebdon, 878 S.W.2d 313 (Tex.Ct.App.1994), after reviewing cases from around the country in which courts have concluded that assignments of legal malpractice claims are invalid for reasons of public policy, as well as the few cases in which courts have concluded to the contrary, the Texas Court of Appeals made an astute observation:
Most legal malpractice assignments seem to be driven by forces other than the ordinary commercial market. In most of the reported cases, the motive for assignment was the plaintiff's inability to collect a judgment from an insolvent, uninsured (or underinsured) defendant. In several instances, the malpractice plaintiff was the original plaintiff who, unable to collect against the original defendant, obtained the malpractice action in hopes of satisfying the underlying judgment.
....
.... To allow such assignments would serve two principal goals: enabling the defendant-client to extricate himself from liability, and funding the original plaintiff's judgment. But to allow assignments would exact high costs: the plaintiff would be able to drive a wedge between the defense attorney and his client by creating a conflict of interest; in time, it would become increasingly risky to represent the underinsured, judgment-proof defendant; and the malpractice case would cause a reversal of the positions taken by each set of lawyers and clients, which would embarrass and demean the legal profession.
Zuniga, 878 S.W.2d at 316-17 (citations and footnotes omitted). As for the "trial within a trial" and the invariable shift in positions that would entail, the court also said:
For the law to countenance this abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a *1078 search for truth. See Picadilly, Inc. v. Raikos, 582 N.E.2d 338, 344-45 (Ind.1991). It is one thing for lawyers in our adversary system to represent clients with whom they personally disagree; it is something quite different for lawyers (and clients) to switch positions concerning the same incident simply because an assignment and the law of proximate cause have given them a financial interest in switching.
Id. at 318.
We think some of the concerns expressed in the above cases may be overstated. Where a claim of alleged legal malpractice arises, the client believes that the attorney has violated a duty owed to the client; thus the attorney-client relationship has already been severely compromised. See Hedlund Mfg. Co. v. Weiser, Stapler & Spivak, 517 Pa. 522, 526, 539 A.2d 357 (1988) ("[W]here the attorney has caused harm to his or her client, there is no relationship that remains to be protected"). Moreover, an attorney may reveal the client's confidences and secrets to the extent that the lawyer reasonably believes it is necessary to establish a claim or defense on behalf of the attorney in a controversy between the attorney and the client. RPC 1.6(b)(2). Although certainly a client who assigns the legal malpractice claim loses control over the lawsuit, and cannot drop the lawsuit upon realizing the full extent of the waiver, the waiver itself is no broader if the claim is assigned than if the client brings the lawsuit himself or herselfthe attorney must still preserve those confidences and secrets that are not reasonably necessary to the defense of the claim. Finally, we are not persuaded that "[t]he almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, [and] promote champerty...." Goodley, 62 Cal.App.3d at 397, 133 Cal.Rptr. 83. Personal injury claims have been assignable in Washington for years, and we have not seen a lucrative business arise in the factoring of those claims.
But we do find the other public policy concerns that the courts of Indiana, Kentucky, the federal district in New Jersey, and Texas have raised in the cases discussed above to be both legitimate and persuasive, namely (1) that permitting the assignment of legal malpractice claims to an adversary in the same litigation that gave rise to the legal malpractice claim ought to be prohibited because of the opportunity and incentive for collusion in stipulating to damages in exchange for a covenant not to execute judgment in the underlying litigation; (2) because the "trial within a trial" that necessarily characterizes most legal malpractice claims arising from the same litigation that gave rise to the malpractice claim would lead to abrupt and shameless shift of positions that would give prominence (and substance) to the perception that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth, thereby demeaning the legal profession; and (3) because to permit such assignments would make lawyers hesitant to accept the defense of defendants who are judgment-proof or nearly so, and who are uninsured or underinsured.
We do not imply that the monetary awards that were stipulated between the guardians ad litem and Mr. Soratsavong in the Benton County personal injury action were necessarily collusivethe injuries to Sivilay and Napha Nammathao were severe, and although Napha has largely recovered, the injuries to her mother are both grievous and permanent. We merely observe that the opportunity and incentive for collusion were certainly present here. Mr. Soratsavong was underinsured; he is of limited means, and his loved ones were severely injured in the motor vehicle rollover. Thus, he had every incentive to stipulate to very high damages, indeed, in the underlying litigation, so as to leave ample room for a more favorable verdict at the "trial within a trial" in the malpractice litigationfor it is only if the "trial within a trial" results in a finding that Mr. Soratsavong was not negligent at all in driving while drowsy, or a finding that the damages to his wife and stepdaughter were substantially less than the amounts of the *1079 stipulated judgments, that his attorneys' alleged negligence could result in a substantial recovery.
We will be remanding this case so that Mr. Soratsavong can continue with the malpractice litigation as the real party plaintiff in interest, and we are mindful that some of these same incentives for collusion might have been present in this particular case, even without the assignment. The guardians ad litem can and presumably will execute upon any judgment that Mr. Soratsavong may receive against his attorneys, and any such judgment is Mr. Soratsavong's only potential means of funding post-injury care for his loved ones, in any event. But we think that prohibiting such assignments in general will provide less incentive for collusion, based on the self-interests of the defendant in the underlying litigation. A defendant who can assign his or her legal malpractice claim in exchange for a covenant not to enforce a judgment in the underlying litigation would have little incentive to seriously litigate the amount of damages allegedly arising from his or her negligence. Moreover, we agree with the Kentucky Court of Appeals that such a stipulated judgment cannot properly serve as an indication of the actual damages, if any there were, as a result of the alleged legal malpractice. Coffey, 756 S.W.2d at 156-57.
Here, there has been no trial in the Benton County personal injury litigation, and so the "trial within a trial" that may follow our remand will be the first trial, as it were, of the underlying personal injury claims. Thus, there may be fewer highly visible and unseemly changes of positions than those envisioned in the Picadilly court's hypotheticaldepending, perhaps, upon the trial strategy chosen by counsel for the respective parties in approaching the matter of the stipulated judgments and the trial court's ruling on the admissibility of such evidence, if it should be offered. We offer no opinion on those matters today, with regard to this particular case, but we find the reasoning of the Picadilly and Zuniga courts to be generally persuasive. As a matter of public policy, we do not wish to lend credence (and substance) to the perception that our adversary system of justice is a game rather than a search for truth, and that lawyers will shamelessly change positions regarding the same incident, depending on where the money lies, because an assignment and the law of proximate causation have given them a financial interest in switching. Zuniga, 878 S.W.2d at 318 (citing Picadilly, 582 N.E.2d at 344-45).
Pointing to Barr v. Day, 124 Wash.2d 318, 879 P.2d 912 (1994), the guardians ad litem argue that we should not be persuaded by these arguments. There, we addressed the doctrine of collateral estoppel as applied to a claim that an award of attorney fees was unreasonable:
As to the unfairness prong [of collateral estoppel], [p]etitioners contend it is unjust to allow Barr to take diametrically opposed positions in two proceedings. First she urged the trial court to approve the settlement including attorney fees, they say, and now she seeks a judgment that the award was unreasonable, a breach of contract, and tortious. However, if she agreed to the settlement and urged its approval based on attorney misfeasance or nonfeasance, it is not unjust to permit her to rectify her error. Mrs. Barr, who has an eight-grade education, simply trusted her lawyers that the attorney fees were reasonable and appropriate. It is hardly unjust to require her lawyers to justify that trust. We conclude that the doctrine of collateral estoppel does not prevent Barr from asserting her claims.
Barr, 124 Wash.2d at 326, 879 P.2d 912. Barr would be on the point if the guardians ad litem were suing the attorney who represented them in the settlement of the Benton County personal injury claim, contending that their wards were charged an unreasonable attorney fee that was approved by the court at their urging. That is not the situation here. Barr is not on point.
Finally, we are persuaded that to permit assignment of malpractice claims to an adversary in the same litigation that gave rise to the claim of malpractice would give rise to conflicts of interest and a resulting reluctance on the part of attorneys to undertake the representation of uninsured, underinsured and judgment-proof defendants. As both the Picadilly and Zuniga courts observed, to permit assignments of legal malpractice *1080 claims to an adversary in the same litigation that gave rise to the malpractice claim would render plaintiffs' lawyers in Washington duty-bound to explore the possibility that the defendants' attorneys erred in the course of representing the defendants where there is no other means of compensating their clients. This would place defense attorneys in a conflict of interest with their clients. Defense attorneys placed in that situation would be duty-bound to send their clients to independent counsel to assess the situationwho among them would dare to do otherwise, even if they did not believe they had committed malpractice? How long would it be before a sizable number of attorneys would become reluctant, even unwilling to undertake representation of defendants with inadequate insurance and minimal assets when to do so might place them, their malpractice insurers and their assets within reach of plaintiffs who otherwise might have an uncollectible judgment? See Zuniga, 878 S.W.2d at 317-18; Goodley, 62 Cal.App.3d at 397, 133 Cal.Rptr. 83 (permitting such assignments would restrict the availability of competent legal services); cf. Evans v. Jeff D., 475 U.S. at 743-66, 106 S.Ct. 1531 (Brennan, J., dissenting, pointing to attorneys' ethical restrictions against opposing settlements that are favorable to their clients based on attorneys' own self-interests; predicting that attorneys will be reluctant to undertake civil rights actions on behalf of indigent claimants when fee waivers become a routine condition placed on favorable settlement offers).
Prohibiting the assignment of legal malpractice claims to an adversary in the same litigation that gave rise to the legal malpractice claim will not prevent clients from pursuing their own legal malpractice claims to judgment, and then assigning their judgments in order to satisfy their own liabilities or submitting to execution upon such judgments. Thus, prohibiting such assignments will not protect lawyers from the consequences of their own legal malpractice. Conversely, permitting such assignments will not make lawyers any more careful to avoid harming their clientslawyers simply do not awaken in the morning intent upon negligently harming one or more of their clients.
In sum, we can see no advantage flowing to the legal system or the public that it serves from permitting assignments of malpractice claims to adversaries in the same litigation that gave rise to the alleged malpractice. Whether there might be an advantage, or at least an absence of undue harm in permitting the assignment of legal malpractice claims in other circumstances, where the concerns that give rise to this opinion do not exist, we do not need to decide, and do not decide today.
We reject the contention of the guardians ad litem that equal protection requires that legal malpractice claims be fully assignable, in that medical malpractice claims are assignable, and malpractice claims against other professionals are assignable, as well. The guardians ad litem rely upon our decision in DeYoung v. Providence Medical Center, 136 Wash.2d 136, 144, 960 P.2d 919 (1998) for this proposition. There, we struck down the eight-year statute of repose contained in RCW 4.16.350(3) on the basis that it offended the privileges and immunities clause of our state constitution by granting the medical profession rights not accorded to other professionals. The guardians' argument overlooks two crucial factors. First, our state constitution vests the judicial power of the State in this court. Const. art. IV, § 1. Under this provision the power of the Supreme Court to regulate the practice of law is inviolate. City of Seattle v. Ratliff, 100 Wash.2d 212, 215, 667 P.2d 630 (1983). And, second, unlike any other professional relationship, the attorney-client relationship is structured to function within our adversarial legal system.
In order to operate within this system, the relationship must do more than bind together a client and a lawyer. It must also work to repel attacks from legal adversaries. Those who are not privy to the relationship are often purposefully excluded because they are pursuing interests adverse to the client's interests.
Picadilly, 582 N.E.2d at 343-44. Indeed, it was the guardians' pursuit of the interests of their wards that gave rise to Mr. Soratsavong's need for the services of Eugster Haskell in this case. If Eugster Haskell *1081 negligently harmed Mr. Soratsavong in the process of that representation, it is for Mr. Soratsavong to pursue his remedies in court, and not for the guardians ad litem to do so. To so rule is not to violate the equal protection rights of other professionals whose relationships with their patients or clients are not intimately intertwined with the very fabric of our adversary system of justice.

II
As the trial court properly recognized, Mr. Soratsavong is the real party plaintiff in interest in the legal malpractice case. The trial court permitted Mr. Soratsavong to substitute as the party plaintiff, but declined to permit relation back to the date the complaints were filed by the guardiansthus Mr. Soratsavong could not proceed with the claim because the statute of limitations had run in the meantime. The trial court believed that it would be improper to relate back because the guardians ad litem did not sue in their own names inadvertently or by reason of excusable mistake; they did so deliberately, and for tactical reasons.
Relying heavily upon Boyd v. Old National Bank, 5 Wash.App. 32, 485 P.2d 469 (1971), Eugster Haskell and the individual defendants argue that the trial court's ruling was not an abuse of discretion, in that it is supported by Washington case law. In Boyd, the decedent's grandmother brought a petition to contest the will of the decedent within the four-month statute of limitations for contesting wills, but the only heirs under the statute of descent and distribution if the decedent had died intestate were the decedent's niece and nephew, who were not parties to the petition. After the four-month statute expired, the executor named in the will sought dismissal of the petition, on the basis that the grandmother was not an interested party and lacked standing to contest the will. The grandmother then filed an amended petition in which the niece and nephew were named as petitionersalthough in earlier discovery, the grandmother had said that she had not filed the suit on their behalves. Neither the niece nor nephew filed any documents of their own indicating an interest in contesting the will. The trial court ruled that the amended petition would not relate back to the date of filing of the original petition. After that ruling, the niece and nephew filed affidavits stating that they concurred in the petitioner's action, and that the grandmother, as the family matriarch, had brought the action on behalf of the family, in accord with tribal customs. The trial court found these affidavits not to be credible, based on the grandmother's earlier testimony to the contrary, and declined to change the ruling. Boyd, 5 Wash.App. at 34-35, 485 P.2d 469. Division Three of the Court of Appeals affirmed the trial court's decision, reasoning that CR 17(a) is intended to prevent forfeiture when determination of the proper party to sue is difficult, or when an understandable mistake has been made. That not being the case in Boyd, the remedial relation back doctrine was not available. Id. at 36, 485 P.2d 469. The defendants argue that Boyd is directly in point.
To the extent that this may be so, Boyd and its progeny must nevertheless be read in light of our decision in Beal v. City of Seattle, 134 Wash.2d 769, 954 P.2d 237 (1998). There, on the very last day of the statute of limitations, Beal, who had earlier been appointed as guardian ad litem for the minor children of the decedent, filed a wrongful death action alleging that negligence on the part of the city of Seattle was a proximate cause of the decedent's death. A wrongful death action must be brought by the personal representative of the decedent's estate, and cannot be maintained by the decedent's children or other survivors. RCW 4.20.020. In the complaint, which was captioned in Beal's name as guardian ad litem for the children, Beal alleged that he was the personal representative of the decedent's estate. In fact, he had not been so appointed, and was not so appointed until 3 months later, when his attorney obtained the appointment, and moved, ex parte, on that same day to amend the complaint to name Beal as plaintiff in his capacity as personal representative. In an affidavit filed in support of the motion, Beal's attorney declared that "`[s]ubsequent to filing herein counsel for Plaintiff recognized the need for the complaint to be brought in the name of the Estate.'" Beal, 134 *1082 Wash.2d at 775, 954 P.2d 237 (quoting Clerk's Papers at 249).
The City answered the complaint without challenging Beal's capacity as plaintiff. Nearly a year later, the City moved to vacate and dismiss the amended complaint, in that it had been improperly obtained on an ex parte basis. Beal conceded that the amended complaint had to be vacated in that it had been improper to seek the amendment ex parte, but moved to amend the original complaint to substitute Beal in his capacity as personal representative, relating back to the date of the original filing under CR 17(a). In an affidavit in support of this request, Beal's attorney admitted that he had known all along that wrongful death actions must be brought by the personal representative of the decedent's estate, and knew when he filed the original complaint that Beal had not yet been appointed as personal representative, notwithstanding the allegation in that complaint that Beal was the personal representative. This affidavit contradicted the earlier affidavit in which the attorney had claimed that he came to this realization after the original complaint was filed.
The trial court denied the motion, reasoning that relation back was improper because there had been no honest or understandable mistake in failing to name the personal representative as the plaintiff in the original complaint. Beal, 134 Wash.2d at 775-76, 954 P.2d 237. Division One of the Court of Appeals affirmed the trial court's ruling in Beal v. City of Seattle, 83 Wash.App. 217, 920 P.2d 1235 (1996). We granted review, and reversed the trial court and the Court of Appeals. In the course of our ruling, we explained the interrelationship between CR 17(a) and CR 15(c):
The purpose of CR 15(c)... is to permit amendment provided the defendant is not prejudiced and has notice. The purpose of CR 17(a) is to protect the defendant against a subsequent action by the party actually entitled to recover and to expedite litigation by not permitting technical or narrow constructions to interfere with the merits of legitimate controversies. Application of the "inexcusable neglect" or "honest mistake" standard to a change in representative capacity undermines the goals, as well as the literal language of the rules. Although we recognize the potential for abuse in a literal interpretation of CR 17(a) if applied in every circumstance, we conclude that allowing an amendment where the only change in the capacity (guardian ad litem as opposed to personal representative of the decedent's estate) in which the suit is brought, when there is no prejudice to the defendant, better meets the literal language of CR 17(a), as well as the purposes of CR 17(a) and CR 15(c).
Beal, 134 Wash.2d at 782-83, 954 P.2d 237.
CR 17(a) provides that every action shall be brought in the name of the real party in interest and states:
No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.
Eugster Haskell and the individual defendants argue that because Mr. Soratsavong did not ratify the guardians' lawsuits and seek to substitute as party plaintiff until after the defendants had objected to the assignment and moved to dismiss the lawsuits, and because the statute of limitations had run in the interim, there was no ratification, joinder, or request for substitution "within a reasonable time." But of course, the situation in Beal was essentially the same. The City of Seattle sought dismissal and vacation of the ex parte amendment to the original complaint because it was improperly obtained without notice, and that motion was granted. The statute of limitations had long since run by the time that Beal sought to amend the original complaint and to substitute as the party plaintiff in his role as personal representative. Indeed, the only appreciable difference between this case and Beal is that here we deal with an assignment that we now have ruled violated public policy, and there, we dealt with a change in representative capacity of the plaintiff. As in *1083 Beal, the action against the defendants in this case was commenced before the expiration of the statute of limitations, and the defendants had notice of the lawsuit. The only prejudice the defendants claim in this case is that the statute of limitations had runwhich was also the case in Beal.
If anything, the equities in this case in favor of relation back are stronger than in Beal. There, the attorney drafted a complaint stating that Beal was the personal representative when he knew full well that such was not the case. Moreover, the attorney filed contradictory affidavits in the trial court regarding what he knew, and when he knew it, about the requirement that wrongful death claims must be brought by the decedent's personal representative. Here, there was no such dissembling. It is true that the guardians' attorney took a calculated risk by advising the guardians to bargain for an assignment of Mr. Soratsavong's legal malpractice claim at a time when the assignability of such claims had not been addressed by the Washington courts, and when the majority of jurisdictions that have decided the issue have concluded that such assignments violate public policy. Nevertheless, a respectable minority of jurisdictions have held that such claims are property, and as such are freely assignable. E.g., Hedlund Mfg., 539 A.2d at 359 (legal malpractice claims arise out of negligence and breach of contract; the rights involved are akin to property rights, which can be assigned prior to liquidation).[7]
In sum, after Beal, the test for relation back under CR 17(a) and CR 15(c) is not whether the wrong party filed the lawsuit out of mistake or inadvertence, or even based upon a calculated risk as to this court's ultimate decision in a case of first impression regarding public policy, but rather whether the defendant had notice of the lawsuit and accordingly was not prejudiced, and whether the real party plaintiff in interest ratified the lawsuit or sought to be substituted as plaintiff within a reasonable time after objection by the adversary. Here, the guardians ad litem, in responding to the defendants' objection, requested the opportunity to substitute Mr. Soratsavong as the party plaintiff if the trial court sustained the objection to the assignment. Upon sustaining the objection, the trial court granted the guardians the right to file a motion to substitute, which they did file, and Mr. Soratsavong promptly joined in the motion. The trial court erred by denying the request that Mr. Soratsavong's substitution relate back to the filing of the legal malpractice claims. We reverse and remand so that the legal malpractice lawsuit may proceed in the normal course, as between the proper parties thereto.
ALEXANDER, C.J., JOHNSON, OWENS, JJ., SMITH, J. Pro Tem., and WINSOR, J. Pro Tem., concur.
IRELAND, J. (dissenting).
Today the majority adopts a rule of law to protect lawyers among all the professions that is only lawyersfrom malpractice claims where the claim has been assigned. The majority adopts this rule protecting our own, members of the bar, from such suits based on public policy grounds which are in fact not exclusive to the legal profession. The confidentiality and fiduciary aspects cited by the majority apply as well to many professionals including physicians, accountants, *1084 psychiatrists, psychologists, counselors, clergy, bankers, brokers, and investment consultants. None of these are privy to the special immunity against assigned claims granted here to lawyers.
To support its public policy concern, the majority invokes the legal profession's sacred cowaccess to justice. The argument is that lawyers may be unwilling to accept cases if they might face malpractice liability in an assigned claim. The same argument could be made for any other professional, yet there is no concern that patients might face an access to medical care problem, surely as concerning to the public as access to justice.
The majority makes much of the opportunity for collusion in an assigned claim. Yet there is not the slightest hint in this record that the judgment for these claimants was a product of collusion. Sivilay Nammathao sustained a severe brain injury and remains in a vegetative state. Her daughter, Napha, suffered a concussion, internal injuries and fractures of the leg and pelvis and will grow up without the companionship of her mother. On September 9, 1999, the court entered judgments nunc pro tunc against Khamchanh Soratsavong, setting damages in excess of $12,000,000 for Sivilay and in excess of $171,000 for Napha. This action required formal proof of damages to the court. Pursuant to CR 55(b)(2) when the amount is uncertain, the court must enter findings and conclusions supporting the amount claimed. After the default was entered when the defendant settled with the plaintiffs, because the settlement was for a minor and an incompetent, the law required that the court approve the settlement. SPR 98.16W.
Until 1982, the opportunity for collusion was used as an excuse to prohibit recovery under insurance policies where the injuries were caused by the negligence of a family member. This notion was debunked in Mutual of Enumclaw Ins. Co. v. Wiscomb, 97 Wash.2d 203, 209-10, 643 P.2d 441 (1982), where the insurer claimed the exclusion was necessary to protect the insurer from collusive lawsuits among family members. "This argument is wholly unpersuasive because the exclusion far exceeds the evil which it is designed to protect against; collusion and fraud are the exception rather than the rule." Id. at 210, 643 P.2d 441; See also Freehe v. Freehe, 81 Wash.2d 183, 189, 500 P.2d 771 (1972) (rejecting the doctrine of intrafamily tort immunity in favor of individualized judicial determinations on issues which may involve intrafamily fraud or collusion). Under the circumstances of this case as well, disallowing assignment altogether because of possible (but unclaimed) collusion flies in the face of public policy rather than supporting it. Concerns about collusion can be addressed in any case, including one where there in an assigned claim. The court is not without recourse where there is an actual charge of collusion.
The majority concedes that the test for assignability in Washington is whether the cause of action would survive to the personal representative of the assignor upon his or her death. If it does, the action is assignable. Majority at 1072. Under the survival statute, a legal malpractice claim survives the death of the assignor and therefore meets the test of assignability in Washington.
The case of Picadilly, Inc. v. Raikos, 582 N.E.2d 338, 340 (1991) is the centerpiece of the public policy argument advanced by the majority. However, this is a fatal selection because the Indiana court rejected common law rules of survivability which "may have outlived their usefulness" according to the majority. Majority at 1073. In Washington, however, the test is statutory, a product of clear, contemporary legislative intent.
The survival statute provides:
All causes of action by a person or persons against another person or persons shall survive to the personal representatives of the former and against the personal representatives of the latter, whether such actions arise on contract or otherwise, and whether or not such actions would have survived at the common law or prior to the date of enactment of this section: PROVIDED, HOWEVER, that the personal representative shall only be entitled to recover damages for pain and suffering, anxiety, emotional distress, or humiliation personal to and suffered by a deceased.... *1085 RCW 4.20.046(1). A legal malpractice claim survives the death of the assignor and is assignable in Washington.
The Picadilly court utilized its constitutional exclusive original jurisdiction over matters relating to the practice of law to justify making public policy decisions about what is best for the legal profession. Majority at 1073. Washington enjoys the same position with respect to the legal profession. RLD 2.1. That this court can make special rules for the legal profession is unchallenged. Rather, the question is should this court exempt the legal profession from assigned litigation where such exemption is not enjoyed by any other profession.
The Picadilly court premised its public policy exception on a supposition that where a malpractice claim is assigned the duties of an attorney of loyalty and confidentiality would be weakened. However, the assignment of a malpractice action really has no bearing on this at all. It is the fact that the lawyer is sued at all for an alleged malpractice that destroys the duty of loyalty and confidentiality. Where a malpractice claim arises, the client believes that the attorney has already violated a duty owed to the client, and the relationship has been severely compromised. "[W]here the attorney has caused harm to his or her client, there is no relationship that remains to be protected." Hedlund Mfg. Co. v. Weiser, Stapler & Spivak, 517 Pa. 522, 526, 539 A.2d 357 (1988). Rather than harming the attorney client relationship, permitting assignment may require the individual attorney to even more zealously endeavor to fulfill each of the duties owed to the client.
Furthermore, despite the personal nature of the relationship, the injuries suffered by the client are pecuniary in nature. There is no reason the injured client should not realize the value of his or her "malpractice claim in what may be the most efficient way possible, namely, its assignment to someone else with a clear interest in the claim who also has the time, energy and resources to bring the suit." Thurston v. Cont'l Cas. Co., 567 A.2d 922, 923 (Me.1989).
Whether the suit is brought by the former client or an assignee is immaterial concerning confidences. The majority says, "[o]nce the client assigns the claim, the client's control over the litigation is lost, but the attorney's right to defend by revealing client information survives." Majority at 1074. This is true, but it is the client who should be able to make that choice at the time of assignment. Because some confidence might be divulged is not a justification to deprive the client of the right to assign the claim. Legal claims are a form of property and people are allowed to dispose of their property as they see fit, as long as the rights of others are not violated or outrageous waste committed. Michael Sean Quinn, On the Assignment of Legal Malpractice Claims, 37 S. Tex. L.Rev. 1203, 1243 (1996).
The majority makes much of the problem of a "trial within a trial." Majority at 1074. In a malpractice claim the plaintiff must prove that but for the malpractice the result in the underlying case would have been more favorable. That is true in all malpractice cases and is not impacted in the slightest by whether the claim was assigned. An attorney may indeed be in the uncomfortable position of blaming his former client for conduct which weakened the case in order to shift the blame from his or her own negligence. The majority characterizes this as judicial estoppel. Majority at 1076-1077. As acknowledged by the majority, there is no problem of judicial estoppel whatsoever in this case because the alleged malpractice was such that the defendant did not get to trial at all on the negligence claim. Majority at 1079. Furthermore, if the problem of judicial estoppel is a sufficient ground to disallow the assignment of a malpractice case, why shouldn't this court just preclude lawyer malpractice cases altogether? The rationale is no different for an assigned case than for one brought directly by the former client.
Finally, the majority cites to the specter of a `"lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, [and] promote champerty...."' Majority at 1078 (quoting Goodley v. Wank & Wank, Inc., 62 Cal.App.3d 389, 397, 133 Cal.Rptr. 83 (1976)). Even the majority *1086 acknowledges that these claims are "overstated." Majority at 1078. Exaggeration in the extreme is more the case. Personal injury cases have traditionally been assignable in Washington State, yet there is no suggestion whatsoever that factoring has occurred at all, let alone factoring in assigned cases. The identical argument could be made by doctors who claim a current malpractice insurance crisis, yet we do not take their plight into account. The assignability or nonassignability is an illusory argument. Because this case should be assignable as would any other case which would survive the death of the assignor, and because this court carves out for lawyers an unwarranted immunity from assigned malpractice litigation, I vigorously dissent.
CHAMBERS and BRIDGE, JJ., concur.
NOTES
[*] Judge Faye Kennedy is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a).
[1] Because we base our decision on other grounds, we do not need to decide whether the limitations placed by the legislature upon who may recover for damages that are personal to the decedent may also limit assignability of claims that arise out of purely personal contracts (such as contracts for marriage or contracts for legal services).
[2] The parties' research reflects that 18 out of 25 states that have examined this issue have prohibited such assignments entirely. A number of these states have done so at least in part because torts arising out of injuries done to the person, reputation or feelings of the injured parties, or arising out of contracts of a purely personal nature (such as marriage) are not assignable in their states, and legal malpractice is seen as a species of injury to the person; moreover, the attorney-client relationship arises from a contract of a purely personal nature. E.g., Goodley v. Wank & Wank, Inc., 62 Cal.App.3d 389, 395-97, 133 Cal.Rptr. 83 (1976) (holding that assignor could not assign her claim for legal malpractice arising out of erroneous legal advice given in a marital dissolution action to one of her creditors in satisfaction of a debt, based on several public policy considerations: (1) the relationship between attorney and client is a fiduciary, confidential relationship of the very highest character that has been jealously guarded and restricted to only the parties involved, so that the attorney cannot substitute another attorney in his place without the client's permission; (2) the damage alleged to be a direct consequence of the attorney's breach of duty to the client does not convert the client's claim to one for property damages arising out of a nonpersonal tort; (3) the assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney, and to whom the attorney has never owed a legal duty, thereby debasing the legal profession, placing an undue burden on the already overburdened judiciary, restricting the availability of competent legal services, and imperiling the sanctity of the highly confidential and fiduciary relationship existing between attorney and client).
[3] The Washington Constitution vests the judicial power of the State in the Washington Supreme Court. Const. art. IV, § 1. Under this provision, the power of the Supreme Court to regulate the practice of law is inviolate. City of Seattle v. Ratliff, 100 Wash.2d 212, 215, 667 P.2d 630 (1983).
[4] The elements of a legal malpractice claim are the same in Washington. See, e.g., Hizey v. Carpenter, 119 Wash.2d 251, 830 P.2d 646 (1992).
[5] See Daugert v. Pappas, 104 Wash.2d 254, 257, 704 P.2d 600 (1985) (trial court hearing a legal malpractice claim arising from litigation typically retries or tries for the first time the client's cause of action which the client asserts was lost or compromised by the attorney's negligence; trier of fact decides whether client would have fared better, but for such mishandling).
[6] Judicial estoppel has not been raised as an issue in this case.
[7] The guardians' attorney may also have been influenced by Woody's Olympia Lumber, Inc. v. Roney, 9 Wash.App. 626, 513 P.2d 849 (1973). There, a judgment creditor obtained a writ of execution and levied upon the judgment debtor's claim for damages in a tort action based on alleged medical malpractice. The trial court quashed the levy of execution. The Court of Appeals reversed, and held that an unliquidated claim for medical malpractice, although not subject to garnishment or attachment, and perhaps not assignable, is nevertheless property that may be executed upon under Washington's execution statute. In Ikuno v. Yip, 912 F.2d 306 (9th Cir.1990) the Ninth Circuit relied upon Woody's Lumber in holding that an unliquidated legal malpractice claim is likewise property that is subject to execution. But as both the Woody's Lumber and the Ikuno courts observed, property that is subject to execution is not necessarily also subject to assignment. See Woody's Lumber, 9 Wash.App. at 633, 513 P.2d 849 ("Assignability affects the value of a property right, but its absence does not extinguish it. It is still property."); Ikuno, 912 F.2d at 315 n. 14 (recognizing that the Woody's Lumber court specifically rejected the argument that assignability is a factor to consider when deciding whether a claim is property under Washington's execution statute).