*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 31**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

EAGLE MOUNTAIN CITY,
*Appellant,*

*v.*

PARSONS KINGHORN & HARRIS, P.C.,
*Appellee.*

---

PARSONS KINGHORN & HARRIS, P.C.,
*Third-Party Plaintiff,*

*v.*

WILLIAMS & HUNT, P.C.,
*Third-Party Defendant.*

No. 20150915
Filed June 7, 2017

On Direct Appeal

Fourth District, Spanish Fork
The Honorable James M. Brady
No. 130300194

Attorneys:

Mark O. Morris, Amber M. Mettler, Douglas P. Farr,
Salt Lake City, for appellant

Stuart H. Schultz, Byron G. Martin, Salt Lake City, for appellee

Phillip A Cole, Minneapolis, Minnesota, Timothy K. Conde,
Lauren A. Shurman, Salt Lake City, for third-party defendant

---

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM, JUSTICE HIMONAS, and
JUSTICE PEARCE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶ 1 Eagle Mountain City (the City) brought this legal malpractice action in its own name, but the district court concluded the action is "tainted in some respect" because it was "born of" an assignment. The court granted summary judgment, dismissing the case without prejudice on the ground that the assignment of legal malpractice claims violates public policy. We reverse. We hold that, even assuming the City assigned its legal malpractice claim, this assignment does not violate public policy.

¶ 2   The City entered into a contractual arrangement with Cedar Valley Water Association (Cedar Valley) to share in any recovery from this legal malpractice action brought against defendant Parsons Kinghorn & Harris, P.C. (Parsons Kinghorn). The parties frame this dispute in terms of whether this arrangement transferred sufficient control over the malpractice claim from the City to Cedar Valley to constitute an assignment. We view things differently. We conclude that the more appropriate question is whether the voluntary assignment of legal malpractice claims violates public policy as a general matter. If it does not, there is no need to determine whether the contractual arrangement in this case amounted to an assignment of such a claim.

¶ 3 We hold that there is a strong presumption that legal malpractice claims are voluntarily assignable, but we do not foreclose the possibility that an assignment in a future case could present such strong public policy concerns that it will be invalidated. We reach this result because the public policy rationales articulated by other courts are largely unpersuasive or inapplicable in our jurisdiction given recent developments in the Utah Rules of Civil Procedure and the Utah Rules of Professional Conduct. With these procedural safeguards in place, legal malpractice claims are presumed to be freely assignable, and the circumstances of this case do not rebut that presumption.

## Background

¶ 4 Cedar Valley sued the City in an earlier proceeding (the Well Lawsuit), which ended when the City and Cedar Valley entered into a settlement agreement and a contingent fee agreement (collectively, Agreements). The Agreements contemplated that the City would bring the lawsuit that is now before us—a legal malpractice action—against its former attorneys, Parsons Kinghorn. We first briefly describe the background of the Well Lawsuit,

providing details relevant to some of the policy considerations we discuss below. We then describe the district court's grant of summary judgment in this case.

¶ 5 The Well Lawsuit arose out of a contract (the Capacity Purchase Agreement) where the City agreed to purchase a well from Cedar Valley. The Capacity Purchase Agreement provided that the City would have an obligation to remit money to Cedar Valley if certain triggering conditions occurred. Parsons Kinghorn advised the City that the triggering conditions had not occurred, and it accordingly advised the City not to remit any money to Cedar Valley. Cedar Valley sought payment from the City, but Parsons Kinghorn repeatedly advised the City that no payment was due.

¶ 6 In response, Cedar Valley brought the Well Lawsuit against the City. That litigation focused on whether the triggering conditions had occurred, requiring payment under the Capacity Purchase Agreement. Cedar Valley, through its lawyers Snell & Wilmer, advanced one interpretation of the contractual language describing the triggering events, and the City, on the continued advice of Parsons Kinghorn, offered a contrary interpretation.[1]

¶ 7 Shortly before the Well Lawsuit was to go to trial, the City and Cedar Valley entered into a settlement agreement, which incorporated by reference a contingent fee agreement. The Agreements impose conditions on the City's ability to bring this malpractice action and give Cedar Valley certain contractual rights of control over the action. For example, the Agreements provide, in relevant part:

> As part of the Settlement Agreement, [the City] has agreed to make demand and if needed file and prosecute a complaint against [Parsons Kinghorn] . . . alleging negligence and related malpractice claims ("Lawsuit"), solely on the terms and conditions of this Agreement.
>
> . . . .

---

[1] The City apparently continued to consult with Parsons Kinghorn during the pendency of the Well Lawsuit, but because an attorney of Parsons Kinghorn was a material witness in that case, the City was represented by separate counsel, Williams & Hunt, P.C., in that proceeding.

[The] City and Cedar Valley desire to retain [Snell & Wilmer] to bring the lawsuit against [Parsons Kinghorn] . . . .

[C]ommunications between the jointly represented Clients [the City and Cedar Valley] and Attorney [Snell & Wilmer] are privileged as to third parties but are not privileged as to the Clients which are being jointly represented.

. . .

In the Settlement Agreement, [the] City and Cedar Valley agreed that after payment of costs, each would receive one-third . . . of the recovery, if any, from [Parsons Kinghorn] in the Lawsuit.

. . .

Clients each agree that [Snell & Wilmer] is entitled to one-third (1/3) of the sums recovered from [Parsons Kinghorn] (including its insurers), after out of pocket costs are first deducted from such recovery.

. . .

[A]ll costs incurred in connection with the Lawsuit shall be paid by Cedar Valley, but all amount of such Costs shall be first repaid from any recovery received.

. . .

In the event that [Parsons Kinghorn] and/or its insurer(s) make an offer of settlement to Clients, and they cannot mutually agree on the terms of negotiated settlement of the Lawsuit, then the clients agree to first negotiate in good faith. Failing an agreement then, the parties shall mediate their dispute before a mediator . . . . In the event the dispute is not resolved by mediation, each of the Clients shall select an arbitrator and the two selected arbitrators shall select a third arbitrator. . . . The decision of the three arbitrators regarding whether to accept or reject the pending offer shall be binding on the Clients.

¶ 8 The City brought the current lawsuit in its own name in December 2013, pleading legal malpractice under both tort and contract theories. A little more than a year later, in February 2015, Parsons Kinghorn filed a motion for summary judgment, seeking to have the suit dismissed on the ground that the City—through the Agreements—assigned its legal malpractice claim to Cedar Valley and that such an assignment violates public policy.

¶ 9 The district court agreed with Parsons Kinghorn that the Agreements constituted at least a partial assignment of the legal malpractice claim, which the court determined violated public policy. In particular, the district court concluded that, although the Agreements did not "express[ly] assign[]" the legal malpractice claim, "it is obvious that the Agreements transfer to [Cedar Valley] a substantial level of control over the litigation decisions and a substantial portion of [the City's] property rights." The court granted summary judgment in favor of Parsons Kinghorn, dismissing the case without prejudice, but attaching certain conditions to the City's ability to re-file. The court ordered that, as a condition of re-filing, the City must "satisf[y] the Court that [the legal malpractice claim] will be prosecuted independently of the settlement agreement. To do so, at a minimum, [the City] needs to establish that its litigation is not controlled in any way by [Cedar Valley], and that [the City] is not represented by attorneys associated with [Cedar Valley.]"

¶ 10 The City appeals. First, it argues that the district court erred in concluding that the Agreements amounted to an assignment of its legal malpractice claim. Second, it argues that its contractual arrangement with Cedar Valley does not violate public policy. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

**Standard of Review**

¶ 11 The issue on appeal is whether the district court properly granted summary judgment in favor of Parsons Kinghorn on the City's legal malpractice claim. Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."[2] We "review[] a summary judgment for correctness, giving no deference to the [district] court's decision."[3]

---

[2] UTAH R. CIV. P. 56(a).

[3] *Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56.

**Analysis**

¶ 12 We begin by explaining why we need not consider the parties' arguments regarding whether the City relinquished sufficient rights to control its legal malpractice claim that it can be said to have assigned that claim. We instead assume that the City's arrangement with Cedar Valley amounted to an assignment. We then consider the public policy concerns articulated by other courts, concluding that they are unpersuasive in view of the current procedural and ethical safeguards of our legal system. Because we view our system as well-equipped to sort the wheat of these claims from the chaff—whether the action is brought by the alleged victim of malpractice or the victim's assignee—we hold that legal malpractice claims are presumed to be voluntarily assignable. But we leave open the possibility that in a future case such an assignment could violate clearly expressed and compelling public policy concerns and thus be invalid.

### I. We Assume the Contractual Arrangement Between the City and Cedar Valley Amounted to an Assignment of a Legal Malpractice Claim

¶ 13 The parties have focused their arguments on whether the Agreements amounted to an assignment of a legal malpractice claim.[4] We think this approach asks the wrong question. These arguments are based on caselaw from other jurisdictions that have expressly concluded that the assignment of legal malpractice claims

---

[4] The City argues that the Agreements did not transfer sufficient control over the litigation to amount to an assignment. It claims that Cedar Valley received only a right to recover a portion of the proceeds from the claim, not the claim itself. Parsons Kinghorn counters that Cedar Valley received contractual rights of control over numerous aspects of the malpractice action, in addition to a portion of the proceeds, and therefore received a partial assignment of the legal malpractice claim. For example, Parsons Kinghorn argues that Cedar Valley received the contractual right to compel this lawsuit to be brought. It also points out that the City is required to "obtain prior approval by [Cedar Valley] before it can settle the claim, or if the parties disagree, ultimately submit its rights to settle its case to binding arbitration." Finally, it notes that Cedar Valley has the contractual right to receive a portion of the recovery obtained in this suit, and it is responsible for fronting all costs in the malpractice action, to be reimbursed out of any recovery.

violates public policy. In those cases, courts have been forced to draw lines between permissible and impermissible levels of control over a legal malpractice claim.[5] But these arguments and the difficult line-drawing they entail signal to us that we should hesitate to embark on this path unless we are first convinced that the assignment of legal malpractice claims violates public policy. If it does not, arguments regarding how much control is sufficient to constitute an assignment are simply irrelevant.

¶ 14 We conclude that the better approach is to first determine whether the assignment of legal malpractice claims violates public policy as a general matter. We turn to that task now, examining public policy rationales that have been articulated by other courts.

## II. There Is a Strong Presumption that the Voluntary Assignment of a Legal Malpractice Claim Does Not Violate Public Policy

¶ 15 The question is whether public policy prohibits the voluntary assignment of legal malpractice claims. We first note that, before wading into the public policy arena, this court, like many others, indulges in a strong presumption of freedom of contract. We have long held that "[f]or a contract to be void on the basis of public policy, 'there must be a showing free from doubt that the contract is against public policy.'"[6] A corollary of this principle is that a contract will be held to violate public policy only where it violates a "well-defined and dominant" policy.[7] When pressed at oral argument, counsel for Parsons Kinghorn described the assignment of legal malpractice claims as—at worst—"unseemly." But even if we agreed

---

[5] *Compare Davis v. Scott*, 320 S.W.3d 87, 91 (Ky. 2010) ("This level of control over a lawsuit is consistent with an assignment of the entire cause of action, not merely the proceeds of the litigation."), *with Weston v. Dowty*, 414 N.W.2d 165, 167 (Mich. Ct. App. 1987) ("Since plaintiffs agreed to assign only a portion of their recovery, if any, from the malpractice suit, and since they did not specifically assign the claim or cause of action . . . , we conclude that no assignment of a legal malpractice action occurred.").

[6] *Ockey v. Lehmer*, 2008 UT 37, ¶ 21, 189 P.3d 51 (quoting *Frailey v. McGarry*, 211 P.2d 840, 847 (Utah 1949)).

[7] *See, e.g., State Farm Mut. Auto. Ins. Co. v. Koshy*, 995 A.2d 651, 665 (Me. 2010) ("A contract is unenforceable as violating public policy . . . only if it violates a well-defined and dominant policy that may be ascertained from the law and legal precedent.").

with that characterization, there is no basis in our law for overriding freedom of contract simply because the result would be "unseemly." Instead, we approach this task by asking whether the assignment of legal malpractice claims violates a clear and compelling public policy.

¶ 16 In looking for such a policy against the assignment of legal malpractice claims, we start with the fact that we have already recognized that the *involuntary* assignment of these claims through bankruptcy does not violate public policy.[8] In upholding these involuntary assignments, we recognized that the public policy interest in allowing access to our courts outweighed any countervailing policy concerns.[9]

¶ 17 Parsons Kinghorn asks us to take a different approach to voluntary assignments. It contends that the voluntary assignment of legal malpractice claims violates public policy as a general matter. The implication of this argument is that we need not look to the specific circumstances of a case to see whether any particular public policy concerns are implicated by its facts, but that there should simply be a blanket prohibition.

¶ 18 We reject this invitation to make such a categorical prohibition. Instead, we examine the concerns articulated by other courts, explaining that each of these concerns is significantly mitigated by safeguards found in the Utah Rules of Professional Conduct and the Utah Rules of Civil Procedure. The concerns can be summarized into four general categories: 1) commoditizing and merchandising of legal malpractice claims; 2) despoiling the sanctity of the attorney-client relationship; 3) sowing the opportunity and incentive for collusion; and 4) fostering public loss of respect for the legal profession. After considering each in turn, we conclude that these concerns do not justify prohibiting the assignment of legal malpractice claims.

---

[8] *See, e.g., Snow, Nuffer, Engstrom & Drake v. Tanasse*, 1999 UT 49, ¶ 13, 980 P.2d 208.

[9] *Id.* ("We are reluctant to permit the denial of access to our courts by persons asserting negligence claims against lawyers in this fashion.").

*A. Concerns Regarding Commoditizing or Merchandising of Legal Malpractice Claims*

¶ 19 Many courts expressing commoditization concerns about the assignment of legal malpractice claims base their reasoning on a 1976 opinion by the California Court of Appeals, *Goodley v. Wank & Wank, Inc.*[10] There, the court reasoned, without citation to authority, that permitting the assignment of legal malpractice claims would spawn a flurry of meritless litigation and debase the legal profession.

> It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers.[11]

¶ 20 As an initial matter, courts that express these types of concerns typically echo the *Goodley* court's qualms about the marketing of legal malpractice claims to investors who are essentially strangers to the underlying subject matter. Some courts have recognized that where the purchaser of a legal malpractice claim has an "intimate connection" with the underlying case, the

---

[10] 133 Cal. Rptr. 83 (Cal. Ct. App. 1976).

[11] *Id.* at 87.

concerns of commoditization are not present.[12] In the case at hand, Cedar Valley had an "intimate connection" with the underlying case by virtue of being a party in the underlying contract that formed the basis for the malpractice action; so we are not presented with concerns of open market commoditization.

¶ 21 But even if Cedar Valley were a stranger to the underlying transaction, we still would not conclude that these concerns are justified. First, the California Court of Appeals has, in dicta, questioned the continued validity of the *Goodley* court's holding:

> Yet there is a legitimate question whether [the *Goodley* court's] view of the legal profession comports with the evolved attorney client relationship of today. The explanation that allowing the assignment of claims would unduly "debase" and "commercialize" the profession may very well have reflected the popular view in 1976. However, the fears which motivated *Goodley*'s defense of an idealized attorney-client relationship are open to some doubt 25 years later. Legal actions against attorneys are now common, and the risk that assignments of claims will generate unfounded litigation unfairly burdening judicial dockets may be too speculative to justify continuing the prohibition. . . . [T]he continued viability of this rule created by intermediate appellate courts, has not yet been tested by the scrutiny of our high court.[13]

¶ 22 Other courts have likewise concluded that these commoditization concerns are speculative.[14] We agree. The speculative nature of these concerns is magnified by the fact that

---

[12] *See, e.g.*, *Thurston v. Cont'l Cas. Co.*, 567 A.2d 922, 923 (Me. 1989) ("We are not here confronted with the establishment of a general market for [legal malpractice] claims; this assignee has an intimate connection with the underlying lawsuit.").

[13] *Musser v. Provencher*, 109 Cal. Rptr. 2d 214, 227 n.7 (Cal. Ct. App. 2001), *review granted and opinion superseded*, 31 P.3d 1271 (Cal. 2001), *and aff'd*, 48 P.3d 408 (Cal. 2002).

[14] *See, e.g.*, *Kommavongsa v. Haskell*, 67 P.3d 1068, 1078 (Wash. 2003) (rejecting the argument that commoditization would be a concern because "[p]ersonal injury claims have been assignable in Washington for years" and the court "ha[d] not seen a lucrative business arise in the factoring of those claims").

several states allow assignment of legal malpractice claims in certain circumstances, and those states have not reported significant problems or been forced to overrule their precedent and abandon the practice.[15] We also note that even courts that prohibit the assignment of legal malpractice claims have allowed the assignment of malpractice claims against other professionals, such as accountants.[16] We see little reason to single out lawyers for protection against malpractice claim assignment when the legal system forces other professionals to face their clients' assignees for alleged malpractice.

¶ 23 We expect that, as the California Court of Appeals itself has noted, some of the concerns that animated courts nearly half a century ago to forbid the assignment of legal malpractice claims are no longer present in the current legal system. We discuss two changes of particular importance: first, the evolution of rule 11 as an effective deterrent of frivolous claims, and second, the trends toward reduced concerns regarding the ancient doctrine of champerty and broader acceptance of third-party litigation funding.

¶ 24 First, in the last forty years there have been significant changes to rule 11 of the rules of civil procedure—a rule that prohibits attorneys and unrepresented parties from, among other things, presenting frivolous claims.[17] The Federal Rules of Civil

---

[15] *See, e.g.*, *New Hampshire Ins. Co. v. McCann*, 707 N.E.2d 332, 337 (Mass. 1999) ("We suspect that fear of 'open trading' is based in part on outmoded concepts and protectionism. We 'have long abandoned the view that litigation is suspect,' and have recently abolished the rule against champerty, now permitting the litigation of claims financed by others in return for their receipt of a portion of the proceeds of the litigation. There is nothing to show that, in those jurisdictions that permit the voluntary assignment of a malpractice claim, there has been an increase in baseless lawsuits." (citation omitted)).

[16] *See, e.g.*, *KPMG Peat Marwick v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 765 So. 2d 36 (Fla. 2000); *First Cmty. Bank & Tr. v. Kelley, Hardesty, Smith & Co.*, 663 N.E.2d 218 (Ind. Ct. App. 1996).

[17] *See* UTAH R. CIV. P. 11(c) ("If . . . the court determines that" a suit is frivolous, "the court may . . . impose an appropriate sanction upon the attorneys, law firms, or parties that . . . are responsible for the violation.").

Procedure often serve as models for states,[18] and the federal version of rule 11 was amended in 1983 to specifically give the rule teeth.[19] Prior to this amendment, the rule "failed to deter abuses in litigation," in part because the rule lacked clarity, which made state and federal courts hesitant to impose sanctions under it.[20]

> This ineffectiveness resulted from several deficiencies in the Rule. For example, the standard requiring 'good ground to support' a pleading was vague. Under this standard, an attorney was required to investigate facts and present them 'to the best of his knowledge, information, and belief.' Courts interpreted this as a subjective and rather vague requirement of good faith and were reluctant to impose sanctions under it. In addition, the only improper purpose for conducting litigation acknowledged by the original Rule was delay. The Rule failed to recognize that litigation can be conducted for other improper purposes, such as to mislead the court, to harrass an opponent, to impose defense costs, or to pressure an opponent into a settlement. Last, courts were reluctant to invoke the

---

[18] While commentators have noted that the recent trend is against states modeling their procedural rules on the federal system, the 1983 amendment to rule 11, which as discussed below substantially bolstered that rule's breadth and effectiveness at curbing meritless litigation, was adopted by many states, including Utah. John B. Oakley, *A Fresh Look at the Federal Rules in State Courts*, 3 NEV. L.J. 354, 382 (2003).

[19] In fact, the 1983 amendments to rule 11 sharpened its fangs so much that commentators criticized the amendments for "foster[ing] excessive and costly litigation unrelated to the merits," and federal rule 11 was amended in 1993 to address some of these concerns. Margaret L. Sanner & Carl Tobias, *Rule 11 and Rule Revision*, 37 LOY. L.A. L. REV. 573, 582 (2004).

[20] Julia K. Cowles, *Rule 11 of the Federal Rules of Civil Procedure and the Duty to Withdraw a Baseless Pleading*, 56 FORDHAM L. REV. 697, 700 (1988) ("Experience showed that in practice Rule 11 failed to deter abuses in litigation. Courts found the Rule difficult to apply and enforce and so were reluctant to use it." (footnotes omitted)).

Rule because they viewed the striking of a faulty pleading as a harsh penalty.[21]

¶ 25 But today, the rule has been refined into a tool that courts use frequently to "deter repetition" in "presenting . . . to the court" claims that are frivolous and factual contentions that lack evidentiary support or a likelihood of such support after further investigation or discovery.[22] We are aware of no court to have explained why rule 11, in its current form, is insufficient to deal with whatever increase there might be in frivolous legal malpractice suits arising from permitting assignment of these claims.

¶ 26 Second, the *Goodley* court's concerns about commoditization spurring an increase in litigation fail to account for the increase in *meritorious* litigation that these assignments will enable. "[P]romot[ing] champerty" is no longer the pressing concern to courts that it once was.[23] The doctrines of champerty and maintenance seek to curb powerful intermeddlers from subverting the legal process by acquiring an interest in litigation that otherwise does not concern them.[24] These doctrines—with their attendant suspicion of third parties meddling in litigation—trace their roots to the English common law.[25] But the primary concerns that motivated these ancient prohibitions are no longer present in today's society, and to the extent they remain, they are adequately addressed by other legal mechanisms.[26] Courts have accordingly moved away

---

[21] *Id.* at 700–01 (footnotes omitted).

[22] UTAH R. CIV. P. 11(b), (c)(2).

[23] 133 Cal. Rptr. at 87.

[24] *See* Note, *Modern Views of Champerty and Maintenance*, 18 HARV. L. REV. 222, 222–23 (1905) ("The object [of champerty and maintenance] was to prevent intimidation of the courts by the great lords, who by enlisting in suits in which they had no proper interest, overawed courts and juries, and perverted 'the remedial process of the law into an engine of oppression.'" (citation omitted)).

[25] In fact, their roots go still deeper, likely back to the concept of "sycophancy" in ancient Greece. *See* Max Radin, *Maintenance by Champerty*, 24 CAL. L. REV. 48, 48–51 (1935).

[26] For example, in *Saladini v. Righellis*, the Supreme Judicial Court of Massachusetts explained that it "no longer [is] persuaded that the champerty doctrine is needed to protect against the evils once feared: speculation in lawsuits, the bringing of frivolous lawsuits, or

(Continued)

from limiting litigation funding in favor of increasing access to justice. This shift recognizes the inherent inequity in allowing a citizen's financial means to curtail his or her ability to vindicate legal rights. Our decision in *Snow, Nuffer, Engstrom & Drake v. Tanasse* to uphold the involuntary assignment of legal malpractice claims represents one illustration of a broader movement away from unduly protecting attorneys at the expense of their clients' ability to access the courts.[27] We continue to adhere to that view today, and we reject commoditization concerns as misplaced and out of touch with the current realities of our society and legal system. We next discuss why we do not share other courts' concerns that allowing assignment of legal malpractice claims imperils the sanctity of the attorney-client relationship.

*B. Concerns About the Effect of Assignment on the "Sanctity of the Attorney-Client Relationship"*

¶ 27 Courts have expressed concern that allowing the assignment of legal malpractice claims will "embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client."[28]

---

financial overreaching by a party of superior bargaining position." 687 N.E.2d 1224, 1226 (Mass. 1997). The court reasoned that "[t]here are now other devices that more effectively accomplish these ends." *Id.* at 1226–27. As examples of these other devices, the *Saladini* court pointed to that jurisdiction's rules of professional conduct and rule 11 of its rules of civil procedure. *Id.* at 1227.

We also note that it is not at all clear why an investor would choose to purchase a lawsuit that appeared to be frivolous. *See Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 104–05 (Tex. App. 2006) ("It is doubtful that litigation funding agreements, . . . in which the investor has no right to repayment unless the plaintiff receives a recovery, serve to increase litigation. Presumably, prior to making an investment . . . , an investor would consider the merits of the suit and make a calculated risk assessment on the probability of a return on its investment. An investor would be unlikely to invest funds in a frivolous lawsuit, when its only chance of recovery is contingent upon the success of the lawsuit.").

[27] 1999 UT 49, ¶ 13 ("We are reluctant to permit the denial of access to our courts by persons asserting negligence claims against lawyers in this fashion.").

[28] *Goodley*, 133 Cal. Rptr. at 87.

Concerns regarding the attorney-client relationship often trace back to *Picadilly, Inc. v. Raikos*, where the Indiana Supreme Court described two problems it concluded would arise if these assignments were permitted: 1) the fear of assignment would cause attorneys to temper their zealous advocacy; and 2) the assignment would interfere with the attorney-client privilege.[29] We are not persuaded by either justification.

1. Concerns that Attorneys Will Temper Their Zealous Advocacy

¶ 28 The *Picadilly* court expressed concern that "[a]n attorney's loyalty is likely to be weakened by the knowledge that a client can sell off a malpractice claim, particularly if an adversary can buy it."[30] According to this line of reasoning, the knowledge that a legal malpractice claim could be assigned will become "an important bargaining chip" in settlement negotiations.[31] Courts have also suggested that permitting assignment would allow an adversary to "drive a wedge" between client and attorney "by creating a conflict of interest."[32] We find none of these concerns persuasive.

¶ 29 Regarding zealous advocacy, the *Picadilly* court suggested that

> If an attorney is providing zealous representation to a client, the client's adversary will likely be motivated to strike back at the attorney in any permissible fashion. If an adversary can retaliate by buying up a client's malpractice action, attorneys will begin to rethink the wisdom of zealous advocacy.[33]

We find this reasoning tenuous. A number of courts have described this concern as "farfetched,"[34] and we agree.[35] We are not convinced

---

[29] 582 N.E.2d 338, 342 (Ind. 1991).

[30] *Id.*

[31] *Id.* at 343.

[32] *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 317 (Tex. App. 1994).

[33] *Picadilly*, 582 N.E.2d at 342.

[34] *New Hampshire Ins. Co.*, 707 N.E.2d at 336–37 ("It is farfetched to imagine that a lawyer will be discouraged from zealously representing a client out of fear that the client may later offer a malpractice action against the lawyer as a part of the resolution of

(Continued)

that attorneys will "strike back" at their adversaries by obtaining and prosecuting unmeritorious legal malpractice actions. If they do so, they face not only the bulwark of rule 11, but the threat of professional sanctions for violating the rules of professional conduct.[36] The desire to "strike back" does not seem likely to outweigh these significant deterrents. Further, the concern that attorneys will temper their zeal fails to account for the fact that attorneys are ethically obligated to act "with zeal in advocacy upon the client's behalf."[37] We find it unlikely that an attorney would choose not to zealously pursue a client's claims out of fear of assignment for the simple reason that by doing so the attorney would likely be giving the client grounds for bringing a malpractice claim.

¶ 30 We are also unconvinced by the concern regarding conflicts of interest. Courts have suggested that, as soon as the topic of assigning a legal malpractice claim rears its head in settlement talks,

---

another case."); *Gregory v. Lovlien*, 26 P.3d 180, 184 n.6 (Or. Ct. App. 2001) ("We note, as [other] courts have, that some of the concerns that typically are cited appear overstated. . . . [T]he risk that a future assignment of the client's malpractice claim to an adversary will temper an attorney's present representation of his or her client seems remote at best. It may ensure that the attorney provides better representation.").

[35] Commentators, too, have criticized this argument. *See, e.g.*, Kevin Pennell, Note, *On the Assignment of Legal Malpractice Claims: A Contractual Solution to a Contractual Problem*, 82 TEX. L. REV. 481, 498 (2003) ("The major flaw in this argument is that it assumes that parties will not act rationally when settling their disputes. . . . [I]f all parties behave rationally, then a legal malpractice claim against an attorney who has zealously and effectively represented his client is worth nothing. An attorney who fears his client will assign his legal malpractice claim to the client's adversary will thus have more incentive to zealously represent his client, not less.").

[36] UTAH R. PROF'L CONDUCT 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous . . . .").

[37] UTAH R. PROF'L CONDUCT 1.3, cmt 1 ("A lawyer must act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.").

attorneys will be forced to send their clients to receive the independent advice of another lawyer because of the conflict of interest inherent in advising a client on the propriety of a settlement involving the assignment of a legal malpractice claim.[38] We understand the forces animating this concern, and we recognize that the need to bring in separate counsel could increase the expense for parties seeking to negotiate settlement of their disputes. But the assignment of a legal malpractice claim may be a pertinent consideration for the parties to the settlement agreement, and if an attorney would be exposed to a conflict of interest necessitating the services of an independent attorney to advise the client on the settlement offer, then that is a necessary cost of litigating a dispute. Foreclosing this option by prohibiting assignment would frustrate opposing counsel's ability to highlight the potential malpractice of an adversary.

¶ 31 This case illustrates the benefits that would be lost by prohibiting assignment: the adversary, who may be in the best position of all to investigate and discover the legal malpractice of an opponent, can negotiate with the victim in a way that allows the victim to recognize the value of its legal malpractice claim. We fail to see how the additional expense that could be incurred if conflicts arise outweighs the benefits that attend permitting such assignments.

2. Concerns that Permitting Assignment Will Do Violence to the Attorney-Client Privilege

¶ 32 The *Picadilly* court also expressed concern that allowing assignment could strain attorneys' duty to maintain client confidentiality. One court reiterated the concern as follows:

> [T]he *Picadilly* court observed that once a client sues his attorney, the attorney is permitted to disclose confidential client information that is reasonably necessary to establish a defense. So long as the client maintains control over the suit, the scope of the

---

[38] *Picadilly*, 582 N.E.2d at 343 ("An adversary might well make a favorable settlement offer to a judgment-proof or financially strapped client in exchange for the assignment of that client's right to bring a malpractice claim against his attorney. Lawyers involved in such negotiations would quickly realize that the interests of their clients were incompatible with their own self-interest.").

disclosure can be limited by the client's power to drop the claim. Once the client assigns the claim, the client's control over the litigation is lost, but the attorney's right to defend by revealing client information survives.[39]

¶ 33 But this concern overlooks the fact that the client waives—to an extent—the attorney-client privilege by bringing a legal malpractice claim.[40] The waiver is no broader whether it is the client or the client's assignee bringing the malpractice claim.[41] We expect that those courts that have expressed concern about the attorney-client privilege may have been concerned about overbroad waivers, but our rules of professional conduct specifically delineate the scope of waiver for defending against a legal malpractice claim,[42] and we see no reason to go beyond that by outright prohibiting the assignment of the claim. Concerns regarding the attorney-client privilege are just as likely to be implicated when a legal malpractice claim is involuntarily assigned through the bankruptcy process, but we have concluded such transfers do not violate public policy as a general matter.[43] We likewise do not see the attorney-client privilege concerns as justifying a barrier to voluntary assignments.

¶ 34 In short, concerns regarding the attorney-client relationship do not justify a blanket prohibition on the assignment of malpractice

---

[39] *Kommavongsa*, 67 P.3d at 1074.

[40] UTAH R. PROF'L CONDUCT 1.6(b)(5) ("A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary: . . . to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client . . . or to respond to allegations in any proceeding concerning the lawyer's representation of the client.").

[41] *Kommavongsa*, 67 P.3d at 1078 ("Although certainly a client who assigns the legal malpractice claim loses control over the lawsuit, and cannot drop the lawsuit upon realizing the full extent of the waiver, the waiver itself is no broader if the claim is assigned than if the client brings the lawsuit himself or herself—the attorney must still preserve those confidences and secrets that are not reasonably necessary to the defense of the claim.").

[42] *Supra* ¶ 33 n.40.

[43] *See Tanasse*, 1999 UT 49, ¶ 13.

claims. Next we discuss why we likewise do not see the opportunity and incentive for collusion to be intolerable.

*C. Concerns Regarding the Opportunity and Incentive for Collusion*

¶ 35 Courts have expressed concern that permitting the assignment of legal malpractice claims yields too fertile an environment for collusion. Courts have reasoned that "[p]ermitting an assignment of a legal malpractice claim to the adversary in the underlying litigation that gave rise to the legal malpractice claim . . . creates the opportunity and incentive for collusion in stipulating to damages in exchange for an agreement not to execute on the judgment in the underlying litigation."[44] The concern is that, "[b]ecause the 'losing' party in the consent judgment will never have to pay, nothing prevents the parties from stipulating to artificially inflated damages that could serve as the basis for unjustly high damages in the 'trial within a trial' phase of the subsequent malpractice action."[45]

¶ 36 While courts have phrased the question broadly—whether any assignment "to an adversary in the underlying litigation" must be prohibited as fostering an opportunity for collusion—a close inspection of these cases reveals that they invariably involve the following: 1) a defendant in the underlying case stipulating to a consent judgment; 2) an assignment of a legal malpractice claim against the defendant's litigation counsel; and 3) a promise not enforce the judgment as long as there is cooperation in the malpractice action.[46]

---

[44] *Gurski v. Rosenblum & Filan, LLC*, 885 A.2d 163, 174 (Conn. 2005).

[45] *Edens Techs., LLC v. Kile Goekjian Reed & McManus, PLLC*, 675 F. Supp. 2d 75, 79 (D.D.C. 2009).

[46] *See, e.g., id.; Skipper v. ACE Prop. & Cas. Ins. Co.*, 775 S.E.2d 37, 38 (S.C. 2015) ("The most common reason other courts have declined to permit assignments of legal malpractice claims is to avoid the risk of collusion between the parties. . . . When an original defendant is essentially relieved of liability, there is little incentive for the consent judgment to reflect the actual loss. As courts around the country have recognized, the potential for inflated damages in such consent judgments is manifest.").

¶ 37 We first note that we are not faced with such an arrangement here. In this case, there is no contractual term providing that the City will owe nothing to Cedar Valley if it signs over its legal malpractice claim. We cannot see how the opportunity and incentive for collusion are intolerably strong where the defendant in the underlying proceeding still feels the sting of the original judgment.[47] If the assignor does not obtain a promise that the assignee will not execute, its incentive to collude is drastically diminished, because the assignor will remain responsible for the judgment.

¶ 38 So the most realistic collusion concerns are not present here. But even if they were, we do not view this concern as necessitating a blanket ban on assignment. To do so, we would have to ignore our legal system's significant procedural safeguards that operate to expose and extinguish unmeritorious claims. We have discussed a number of these above, and we reiterate them briefly here.

¶ 39 As noted above, rule 11 operates to cull frivolous lawsuits and impose sanctions on parties and attorneys who foster them.[48] Second, a party who brings a malpractice action that is the product of collusion will have to survive motions to dismiss and for summary judgment. Even if the claim can survive these procedural gatekeepers, the plaintiff bringing the collusive suit will have to face the jury, and the facts regarding the opportunity and incentive for collusion will be on full display. Attorneys who bring collusive, frivolous claims will be subject to ethical repercussions.[49]

¶ 40 We have confidence that these serious deterrents are sufficient to discourage attorneys considering concocting a scheme to inflate damages and then bring a legal malpractice action against a former adversary's attorney. To conclude that the assignment of

---

[47] *See, e.g.*, *Edens*, 675 F. Supp. 2d at 79 ("Edens had no incentive to contest the extent of damages, because as long as it secured from Golf Tech a promise not to execute on the judgment, Edens would never have to pay anything. It is evident from the Settlement Agreement that there was no reason for Edens to try to minimize damages.").

[48] *See supra* ¶ 25.

[49] UTAH R. PROF'L CONDUCT 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous . . . .").

legal malpractice claims must be prohibited assumes that our legal system is insufficient to ferret out unmeritorious claims. We are not so skeptical of the process that we would ban these assignments out of fear of potential collusion.

*D. Concerns Regarding a Public Loss of Respect for the Legal System*

¶ 41 Finally, courts have expressed concern that the public may lose respect for the legal system if they observe lawyers "shameless[ly] shift [] positions" between an underlying action and a subsequent malpractice trial.[50] The problem arises when the assignee of a legal malpractice claim attempts to prove causation. To do so, the assignee must prove that the judgment it obtained in the underlying proceeding was obtained solely due to the malpractice of litigation counsel in that underlying case, and not because the defendant was indeed liable.

¶ 42 To illustrate, consider a personal injury action. After securing a judgment against the defendant, the plaintiff promises not to execute on it in exchange for the defendant's assignment of a malpractice action based upon the defendant's attorney's purportedly negligent conduct in that action. The subsequent malpractice action's trial-within-a-trial will feature the assignee attempting to show that, but for the defendant's attorney's negligent performance in the underlying case, no judgment would have been obtained. That would require the plaintiff to show that the defendant was not negligent, or that the defendant's negligence did not cause the plaintiff's injury—diametrically opposite positions to those taken in the underlying suit.[51]

¶ 43 Courts have identified this switch of positions as intolerable because in their view it demeans the legal profession. One court expressed the concern as follows:

> [T]he "trial within a trial" that necessarily characterizes most legal malpractice claims arising from the same litigation that gave rise to the malpractice claim would lead to abrupt and shameless shift of positions that would give prominence (and substance) to the perception that lawyers will take any position, depending upon where the money lies, and that

---

[50] *See, e.g., Zuniga*, 878 S.W.2d at 318.

[51] *See id.*

litigation is a mere game and not a search for truth,
thereby demeaning the legal profession.[52]

Courts have expressed concern that jurors seeing such a position
shift "would rightly leave the courtroom with less regard for the law
and the legal profession than they had when they entered."[53]

¶ 44 We note first that the identified "shameless shift of
positions" is not present in all legal malpractice assignments. "The
fact that an attorney might be called on to defend against an
assigned malpractice claim does not always mean that the attorney's
former adversary will compromise the strength of his underlying
claim, resulting in some sort of role reversal which diminishes public
confidence in the legal profession."[54] Even the *Picadilly* court—one of
the first to raise this concern—recognized that "[s]hifts in position
are inevitable as long as clients are allowed to bring malpractice
claims, and attorneys are permitted to fight them."[55]

¶ 45 The case before us does not feature a shameless shift of
positions. Here, no attorney needs to take a position directly
contrary to one argued earlier. The attorneys defending Parsons
Kinghorn may present the same theory of the Capacity Purchase

---

[52] *Kommavongsa*, 67 P.3d at 1078.

[53] *Picadilly*, 582 N.E.2d at 345.

[54] *New Hampshire Ins. Co.*, 707 N.E.2d at 337. The *New Hampshire
Ins. Co.* court went on to recognize that

It could be argued just as forcefully that, providing shelter for
attorneys by prohibiting the voluntary assignment of malpractice
claims, would actually diminish public confidence in the
profession by creating the perception that the system provides
attorneys with unjustified special protection. . . . "Rather than
helping the image of the legal profession, a rule of non-
assignability would give the impression that the profession has
something to hide, that the courts are taking care of their own. A
more favorable image will be projected by an acknowledgement
that [the legal] profession, like any other, must face its problems
and answer its accusers. Vindication after a full airing of the facts
is a much better result than the suspicion that would follow a
suppression of the facts."

*Id.* (second alteration in original) (citations omitted).

[55] 582 N.E.2d at 345 n.10.

Agreement that Parsons Kinghorn advised the City to take regarding the City's contractual obligations. And Snell & Wilmer may continue to advocate the same theory of that contract that it advised Cedar Valley to take. So no attorney will be required to advocate for a position that he or she did not advocate for in the underlying case. The only role reversal here is by the City, the alleged malpractice victim. And though the City is switching positions, this is the kind of switch that, as the *Picadilly* court recognized, is inherent in a legal malpractice action. There is nothing shameless or disreputable about a client who was the victim of an attorney's negligent advice repudiating the position that it took as a result of that bad advice.

¶ 46 Further, we are not persuaded that the concern about position shifting is significant enough to ban altogether the assignment of legal malpractice claims. As a practical matter, an attorney who shifts positions can expect to have that shift highlighted for the jury.[56] The exposure of the shift of positions would present a significant risk of the jury concluding that no malpractice had occurred. So an attorney who plans to so shift positions would need a convincing explanation to account for the shift in positions. That explanation may well ameliorate whatever loss of respect a jury might otherwise experience.

¶ 47 In sum, the public policy concerns that have been voiced by courts on the subject of assigned legal malpractice claims are not present on these facts. But even if they were, we are not persuaded that these concerns are sufficiently clear and compelling to justify prohibiting the assignment of legal malpractice claims.

### Conclusion

¶ 48 We conclude that the rationales that have been offered against the assignment of legal malpractice claims are unpersuasive in view of our jurisdiction's procedural safeguards, including our rules of civil procedure and rules of professional conduct. We accordingly hold that legal malpractice claims are presumed to be voluntarily assignable. We do not foreclose, however, the possibility that a future case could present an assignment that violates clearly defined and compelling public policy concerns and therefore be deemed invalid. The contractual arrangement between the City and

---

[56] *See* Pennell, *supra* ¶ 29 n.35 at 502; Michael Sean Quinn, *On the Assignment of Legal Malpractice Claims*, 37 S. Tex. L. Rev. 1203, 1233 (1996).

Opinion of the Court

Cedar Valley does not implicate any such concerns. We therefore reverse the grant of summary judgment and remand for further proceedings.

———————